UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

United States Courts
Southern District of Texas
FILED

AUG 13 2021

Nathan Ochsner, Clerk of Court

————————————————— X

Edward Ji, filing pro se

                Plaintiff,

                v.

Patrick L. O'Daniel,
    Chairman of the Texas Board
    of Criminal Justice,
    in his official capacity,
                Defendant

————————————————— X

COMPLAINT

Civil Action

No. ————

## I. JURISDICTION & VENUE

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 and 1343 (a)(3).   Plaintiff Ji seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202, and injunctive relief authorized by 28 U.S.C Section 2283 & 2284 and Rule 65

- 1 -

of the Federal Rules of Civil Procedure.

2.      The Southern District of Houston is an appropriate venue under U.S.C. 1391 (b)(2) because it is where the plaintiff resides, as well as the headquarters of the Texas Board of Criminal Justice — Institutional Division.

## II. PLAINTIFF

3.      Plaintiff, Edward Ji, is a prisoner of the State of Texas, in the custody of the Texas Department of Criminal Justice (TDCJ), confined in Ferguson Unit, in Midway, Texas.

## III. DEFENDANT

4.      Defendant, Patrick L. O'Daniel, is the Chairman of the Texas Board of Criminal Justice. He is the signing authority of the Uniform Inmate Correspondence Rules, Board Policy 03.91 (rev. 5), approved June 25th, 2021. (Attachment A).

5.      He is sued in his official capacity, for actions under the color of state law. His address is PO Box 13084,

-2-

Austin, Texas, 78711.

## IV. FACTS

6.    On June 25th, 2021, the Texas Board of Criminal Justice passed Board Policy 03.91 (rev. 5), announcing a new definition of "sexually explicit image" as:

7.    "materials in publications, photographs, drawings, or any type of image, which depicits sexual behavior, is intended to cause sexual excitement or arousal, or shows: frontal nudity of either gender, including the exposed female breast(s) with nipple(s) or areola(s); the genitalia, anus, or buttocks, or partially covered buttocks of either gender; the discharge of bodily fluids in the context of sexual activity; or sexual behavior from any vantage point."

8.    The new parts of this policy are "intended to cause sexual excitement or arousal" and "buttocks, or partially covered buttocks." (DEFINITIONS, page 3)

9.    B P 03.91 also bans any "altered photo or a

- 3 -

photo that conceals or hides the face of the individual photographed"
(Section IV (A)(11), page 10).

10.    Around June 28, prison staff posted a "Notice to Remove
Contraband" on every housing block, ordering inmates to "remove" the
photos and publications retroactively declared contraband from their
possession, or face disciplinary action. On August 1st, confiscations
began.

11.    The Plaintiff owns a number of photos that falls into one
or both categories. The new policy also limits what publications the
Plaintiff can read or order, creating uncertainty on what's allowed.

## V. EXHAUSTION OF
## INSTITUTIONAL REMEDIES

12.    The Plaintiff wrote a Step 1 Grievance July 3rd, asserting
the new BP 03.91 is unconstitutional. It was returned unsigned July
9th: "The issue presented is not grievable." A Step 2 Grievance (appealing
a Step 1) requires a "completed" Step 1 "signed by the Warden... You may
not appeal a Step 1 that has been returned unprocessed." (See Miller v.
Tanner 196 F. 3d 1190 (11th Cir. 1999)).

– 4 –

13. No further institutional remedies are provided by TDCJ.

## VI. LEGAL STANDARDS FOR PRISON CENSORSHIP

14. The original legal standard for "sexually explicit" material in Texas prisons was set by Guajardo v. Estelle (432 F Supp 1373, 5th Cir. Appeal 580 F 2d 748), when this very district court ruled that prison mailrooms could not unilaterally declare material "obscene," only that it "violates the penal code." (5th Cir. supra at 757), allowing prisons to reject only a "graphic presentation of sexual behavior that is in violation of the law." (supra at 762). Administrators had to "make a specific, factual determination that the publication was detrimental to prisoner rehabilitation because it would encourage deviate, criminal behavior." (supra at 762). Further censorship was not essential to the state's interest in "security, order, or rehabilitation."

- 5 -

15.      Interestingly, BP 03.91 reflects this old standard on page 12, under Rejection Due to Content (d): "A specific determination has been made that the publication contains graphic presentations of sexual behavior that is in violation of the law, such as rape, incest, sex with a minor, bestiality, or necrophilia." It then, in a post-Gugjardo addition, redundantly bans publications if "f. It contains a sexually explicit image" — a term TDCJ has unilaterally redefined multiple times over the last 44 years, to now include "partially covered buttocks" right alongside child rape and sex with dead animals.

16.      Since Thornburgh v. Abbott (490 US 401, 109 S. Ct. 1874 (1989)), the courts have applied the "Turner test" to incoming prison mail (Turner v. Safely 482 US 78, 107 S. Ct. 2254 (1987)) to judge whether prison regulations may "reasonably" restrict constitutional rights:

- 6 -

1. Is the regulation reasonably related to a legitimate, neutral government interest?

2. Do alternative means of exercising the right remain open?

3. How much would accomadation of the right impact guards, other inmates, and prison resources?

4. Is there a ready alternative to the regulation in question?

17.    Turner, however, addressed only an inherently dangerous type of correspondence (inmate to inmate letters), but not "the content of expression."

18.    "We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of expression" (Turner v. Safely 482 US 78,

- 7 -

90, ref'ing <u>Pell v. Procunier</u>, 417 U.S, at 828, 94 S. Ct. 2804; and <u>Bell v. Wolfish</u> 441 US, at 551, 99 S. Ct. 1861).

19. <u>Thornburgh</u>, however, found that publications could not be rejected "solely because its content is religious, philosopical, political, social, <u>sexual</u>, or because its content is unpopular or repugnant" (109 S. Ct. 1877, emphasis added), allowing the ban of material if it's "(1) Homosexual, (2) Sado-masochistic, (3) Bestiality, (4) Involving children" (<u>Thornburgh v. Abbott</u>, 90 US at 405, 109 S. Ct. at 1877, footnote 6).

20.      And even <u>then</u>, a publication with one of the "criteria" for exclusion <u>may</u> be rejected, but only if the warden himself determines it "detrimental to the security, good order, or discipline of the institution or if it may facilitate criminal activity." (supra, 90 US at 405, 109 S. Ct. at 1877). The policy in <u>Thornburgh</u> even states "(b)(1). Explicit heterosexual material ordinarily will be admitted." (footnote 6).

- 8 -

21.    TDCJ, similarly, used to allow publications unless "a specific factual determination has been made that the publication is detrimental to prisoner's rehabilitation because it would encourage deviate criminal sexual behavior," and that "Publications shall not be excluded solely because they have sexual content" (Rule 3.9.10.6, aff'd in <u>Thompson v. Patterson</u> 985 F 2d 202 5th Cir. (1993)). In <u>Thompson's</u> case, "The notice (of denial) identified particular pages of each book that contained graphic depicitions of sex with a child... incest, or... homosexual activity" (<u>Id</u> at 204), and later "sadomasochistic bondage."

22.    The Fifth Circuit then specifically states: "Because the limits on inmates' First Amendment rights could not be guided solely by "the whims of administrators," we set forth the following guidelines: "Before delivery of a publication may be refused, prison administrators must review the particular issue of the publication in question and make a specific, factual determination that the publication is detrimental to prisoner rehabilitation because it would encourage <u>deviate, criminal sexual behavior.</u>"' (<u>Id</u> at 206, emphasis added).

## VII ARGUMENT

23.    BP 03.91's ban on "any type of image" that

· depicts "sexual behavior"

· is intended to "cause sexual excitement or arousal"

· or shows "buttocks, or partially covered buttocks"

is unconstitutionally wide and vague, and impermissably "invited prison officials and employees to apply their own personal prejudices and opinions as standards for prison mail censorship" (Procunier v. Martinez 416 US 396, 416 (S. Ct. 1974)), leaving rejections "based on personal prejudice or categorical assumptions rather than individual assessments of risk" (Thornburgh v. Abbott 109 S. Ct. at 1890).

24.    These regulations would cover inmate art, outside art, comic books, photos from inmates' wives, girlfriends, boyfriends, husbands (See Attachment B), as well as magazines like Muscle & Fitness, Low Rider, Tatoo Society, and US Weekly — anything with a swimsuit model, sexy advertisement, or "partially covered buttock."

25.    BP 03.91's ban on photos "that conceal or hide the face of the individual photographed" could further prohibit photos of:

- a child's Halloween costume
- a flexed bicep
- sneakers on feet
- a skinny waist
- a wedding ring
- anyone wearing large sunglasses or Covid mask
- anyone turned away from the camera.

26.      This rule would prohibit photos of pratically any human body part except the face. If the Defendant disputes that the policy would be thus interpretated, it should be noted that this policy, as written, is open to wildly different interpretations.

27.      BP 03.91 also violates the rights of vendors and publishers, upending businesses like Inmate Magazine Service without prior notice or just cause: "Publishers who wish to communicate with those who, through subscription, willingly seek out their point of view have a legitmate First Amendment interest in access to prisoners" (Thornburgh v. Abbott 109 S. Ct at 1874).

28.      And since general correspondence rules touch not only on the rights of the prisoner to recieve mail, but the rights of

persons not incarcerated to send mail" (Guajardo v. Estelle 580 F 2d at 754), BP 03.91 also violates First Amendment rights of inmates' families, romantic partners, and other correspondents (See Attachment B).

### VIII. TURNER TEST
### ("Sexually Explicit" Images)

29.    Does banning "partially covered buttocks" serve a legitimate, neutral government interest?

30.    The Defendant has published no reasons for the new mail policy, but two reasons have historically been used for denying explicit material in prisons:

      1. to rehabilitate sex offenders
      2. to prevent sexual misconduct

31.    The first reason is undercut by Defendant's own policy: "Sexually Explicit Image" specifically excludes the "chests of infants and pre-pubescent children... unless further restricted by a treatment program policy." (BP 03.91 DEFINITIONS, page 3, emphasis added). TDCJ has multiple Sex Offender Treatment Programs (SOEP, SOTP-9, SOTP-18) with their own housing and rules on sexual material.

Applying the same regime of censorship to over 100,000 people who are <u>not</u> sex offenders would (unnecessarily) use up far more prison resources (<u>Turner</u> question three).

32.     The second reason — to prevent inmates from raping each other or exposing themselves to guards — is not "reasonably related" to the possession of private pictures. There is no evidence Cardi B's "partially covered buttocks" are "presumptively dangerous" (<u>Turner</u> at 107; S. Ct at 2261, ref'ing <u>Bell v. Wolfish</u> 441 U.S. 52, 99 S. Ct. 1861, and <u>Jones v. North Carolina Prisoners' Union</u> 433 U.S. 119) or a threat "to the security, good order, or discipline of the institution" (<u>Thornburgh v. Abbott</u>, 109 S. Ct. at 1877).

33.     Even if they were, why did TDCJ wait 130 years after its founding to ban them? Sexual assault has plummeted for decades. There are far more effective ways to fight sexual misconduct in prison: the Safe Prisons office, the Prison Rape Elimination Act (PREA), or simply punishing <u>misconduct</u>, rather than trying to prevent human arousal.

34.     The Defendant may therefore attempt to find a novel,

third "legitimate government interest" — to prevent the "trafficking and trading" of inmate property. The logic is that inmates could not give away, trade, or sell these photos if they were all declared contraband.

35.     The enormous black market in prison — which is 100% of the economy, since prisoners are forbidden from earning wages, having a business, or engaging in any kind of exchange — includes the trading of books, newspapers, manga, haircuts, portraits, tattoo patterns, tattoo needles, tattoo ink (cooked with homemade candles), tattoo guns made from magnets and wire, homemade cinnamon rolls, tacos grilled on bunks over disassembled hot pots, birthday cards with pop-up castles and candy-wrapper clouds, Magic the Gathering cards, Victorian ships assembled in hot sauce bottles, laundry services, legal services, banking services (conducted in units of mackeral), pet spiders, pet turtles ($50!), pet bats (!), poison blowguns (really), iPhones, synthetic marijuana, synthetic heroin, synthetic vaginas, pagan spellbooks, Jewish chocolates, and speakers made from library books by inmates who failed 6th grade math, but somehow understand electromagnetism...

- 14 -

This suggests:

    1. BP 03.91 will not significantly reduce "trafficking and trading" in prison, and

    2. TDCJ may have other priorities to dedicate itself to.

36.    To answer the second <u>Turner</u> question, BP 03.91 is so wide, it <u>deliberately</u> excludes all "alternate means" of mailing, possessing, or even drawing "any type of image" that could cause "arousal" (DEFINITIONS, "Sexually Explicit Image").

37.    For the third <u>Turner</u> question, the impact / cost of <u>not</u> censoring these images would be zero (to continue previous policy), or actually <u>reduce</u> costs (See Paragraph 31).

38.    If however, the court returns TDCJ to a <u>Guajardo</u> standard, to allow "sexually explicit" material that is actually explicit, the Defendant will likely claim fear of some unidentified "ripple effect" (<u>Turner</u> 109 S. Ct. at 2263, ref'ing <u>Fraise v. Terhune</u> 238 F. 3d 506, 520). The Defendant however, would then have to show how this threatens security, or another legitimate government

interest, and not merely offend the morals or religious views of the Defendant and his staff.

39.     The answer to the final Turner question, whether a "ready alternate" to the offending regulation exists, is obvious: simply remove the overly vague and unreasonable clauses on "depicts sexual behavior," "is intended to cause sexual excitement or arousal," and "buttocks, or partial buttocks." (BP 03.91 DEFINITIONS, "Sexually Explicit Image").

40.     Or, the court could adopt the Guajardo standard, banning "graphic presentation(s) of sexual behavior that is in violation of the law," which is already part of BP 03.91 (Section IV (A)(9)), and strike down the redundant Section IV (A)(10): "Contains a sexually explicit image."

## IX TURNER TEST
(Photos of "unidentified" people)

41.     TDCJ claims it has a security interest in identifying people in photos. How, however, does it identify anyone in photos? Does it scan millions of photos through facial recognition software?

-16-

If not, it has no legitimate interest in seeing faces it cannot identify anyway.

42. If it _does_ scan them, the blanket use of such software is not disclosed to inmates or their correspondents.

43. If TDCJ has a _specific_ concern that a faceless photo poses a security threat or involves a "criminal scheme," it could ban the photo _for that reason_ (BP 03.91 Section IV (A), parts (1), (2), (3), (4), (5), (6), (7), (8), and (12)).

44. Banning photos of the back of people's heads is far wider than necessary to be "reasonably related" to crime prevention. It is an "exaggerated response" under _Turner_ (107 S. Ct. at 2256).

45. _Turner_ question 2: Unreasonable as it is, correspondents could accomadate it by contorting camera angles (or their bodies) to present an "identifiable" face in all photos.

46. _Turner_ question 3: Repealing the policy though, would cost TDCJ nothing, and even save the costs of rejecting, notifying, and appealing many photos. No harmful "ripple effect" would occur, since these photos have been coming into TDCJ for decades.

47.    <u>Turner</u> question 4: The obvious alternative to this policy is to simply not implement it, letting TDCJ use its ample powers to reject photos for specific security concerns.

## X. LEGAL CLAIM

48.    Plaintiff reallege and incorporate by reference paragraphs 1 - 47.

49.    The Defendant's implementation of BP. 03.91 violates the Plaintiff's First Amendment right to be free of unreasonable uncensorship, causing continuous and compounding injury to the 150,000 inmates of TDCJ as they lose their mail and property, and suffer disciplinary punishments in the name of this unconstitutional policy.

## XI PRAYER FOR RELIEF

50.    WHEREFORE, the Plaintiff respectfully prays that this court enters judgement:

51.    Granting the Plaintiff a declaration that the policy described herein, BP 03.91, violates his rights under the Constitution and the

-18-

laws of the United States, and

52.       A preliminary and permanent injunction ordering the Defendant to repeal any and all parts of BP 03.91 the court deems unconstitutional.

53.       Plaintiff also seeks recovery of his costs in this suit ($350), and

54.       Any additional relief this court deems just, proper, and equitable.

## VERIFICATION

I hereby certify under penalty of perjury the foregoing complaint is true and correct.

Executed at Midway, Texas, on August 4th, 2021.

Respectfully submitted,

Edward Ji

Edward Ji  01575341
Ferguson Unit
12120 Savage Drive
Midway, Texas  75852

- 19 -

IN THE UNITED STATES
DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

_____ x

Edward Ji,
        Plaintiff

        v.

Patrick L. O'Daniel,
        Chairman of the Texas Board
        of Criminal Justice,
        in his official capacity,
        Defendant

_____ x

SUMMONS

Civil Action
No. _____

TO THE ABOVE NAMED DEFENDANT:

    You are hereby summoned and required to serve upon the plaintiff, whose address is Ferguson Unit, 12120 Savage Drive, Midway, Texas, 75852; an answer to the complaint which is herewith served upon you, within 20 days after service of this summons, exclusive of the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint.

Clerk of the Court

Date: _____



Edward M 01575341
Ferguson Unit
12120 Savage Drive
Midway TX 75852

United States Courts
Southern District of Texas
F I L E D

AUG 1 3 2021

Nathan Ochsner, Clerk of Court

U.S.
Sout
P O
Hous